NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

ALEXANDER PATASKY, PETITIONER, v. SINGER MANUFACTURING COMPANY, RESPONDENT.

For the petitioner, *Edwin Joseph O'Brien.*

For the respondent, *Ralph Cooper,* of *Palmer & Cooper.*

\* \* \* \* \* \* \*

The petitioner, a foreigner, who speaks very poor English, was sworn, and testified that while working on a car at the Singer company plant, that the vamp broke, precipitating him to the ground, where he struck the back of his head, his chest and back. Under repeated questioning, both by the attorney for the petitioner and the attorney of the respondent, as well as by myself, the petitioner was emphatic in his state-

ment that he injured the back of his head pointing to the base of the skull, the chest, and also the lower portion of the back. The petitioner, from my close observation of him while on the stand, was an individual of very lethargic temperament, his reactions being very slow, and his eyes having a far away look in them. He is a man of rather attenuated stature, with somewhat of a stooping posture, high cheek bones, which show prominently because of the lack of flesh on his face. Due to the petitioner's poor conception of the English language, it was extremely hard to get anything out of him without the aid of an interpreter. The petitioner testified that sometime later, following the accident of July 2d, 1926, at which time everything "turned black," he had gradually lost weight, become more irritable, more nervous, more restless at night, with the passing. of time, gradually lost his appetite, and that although he has endeavored to work as steadily as possible since the accident, he has reached the stage where he is unable to continue steadily at work.

His wife was next sworn, and she testified that beginning at a time approximately a year after the accident, although she is not clear as to the exact time, the petitioner has become so irritable that he has beaten her and choked her and, on one occasion at least, bit her on the arm, and that this temperamental change is in direct contrast to his attitude before the accident. She testified that before the accident he was a quiet, normal-acting man, but that since the accident he has gradually developed to a condition which makes her living with him practically unbearable, not to say dangerous.

The petitioner next produced Dr. Szerlip, an orthopedic surgeon who stated that his orthopedic findings were practically negative and that in his opinion the case was a neurological one. Dr. Szerlip took four X-rays which were introduced in evidence to corroborate his findings.

Dr. Dias, an expert eye, ear, nose and throat doctor, was next introduced on behalf of the petitioner and testified that he made two examinations of the petitioner. One on January 28th, 1928, and the second examination on March 15th, 1928. At the first examination Dr. Dias testified he found nothing attributable to the accident of July 2d, 1926, but that on the

second examination of March 15th, 1928, he found a tubular vision, which he ascribed to a brain lesion, and stated that in his opinion, due to accident also, the case was a neurological one.

Dr. Bergman, an expert in the field of neurology was next introduced by the petitioner, and testified that he treated the petitioner, for his head injury, beginning at October 15th, 1926, and continuing for some seventeen or eighteen treatments until February 17th, 1927. Dr. Bergman testified that his bill for treatment was $85, which has not as yet been paid. A very significant point is to be noted at this stage of the case, and that is, Dr. Bergman who was called upon to treat the petitioner, by the petitioner, obtained a history from the petitioner as to the accident, in which the petitioner informed Dr. Bergman that he had injured his head, as well as other portions of his anatomy. Certainly, if Dr. Bergman is to be believed, if the petitioner went to him for treatment for his head, as well as other parts of his anatomy, at that early stage, it strongly tends to corroborate the petitioner's story of a head injury, and I might note, in passing, that inasmuch as the petitioner went to Dr. Bergman for treatment for his head condition, after his discharge from treatment by the respondent, and inasmuch as the respondent did not treat him for his head condition, that Dr. Bergman's bill is properly allowable against the respondent as part of the treatment of petitioner's condition, so that Dr. Bergman's bill of $85 for treatment is allowed against the respondent. Inasmuch as Dr. Bergman's testimony as to treatment and history stands undisputed in the case, and inasmuch as his credibility has not been effected, I am led to the conclusion that as early as three months following the accident the petitioner went to a doctor for treatment for a head condition, which he alleged to be due to the accident of July 2d, 1926. Dr. Bergman examined petitioner the morning of the first hearing, March 20th, 1928, and found, so he says, a developed neurotic condition, accelerated or increased from that found by him in February, 1927. Dr. Bergman says that the present picture is the result of the trauma of July 2d, 1926, and places the disability at over sixty per cent. So much for that.

Next we come to the testimony of Dr. Prout, a neurologist introduced on behalf of the petitioner who examined the petitioner on several occasions, and whose positive assertion is that the present condition of the petitioner is due to the accident of July 2d, 1926, wherein the petitioner suffered a brain injury. Dr. Prout places the petitioner's disability at fifty per cent. Cross-examination of Dr. Prout only served to intensify the fact that Dr. Prout's emphatic opinion was that the man has reached his present state of permanent disability to the extent of fifty per cent., as Dr. Prout puts it, as a result of the trauma inflicted upon him on July 2d, 1926. I must say that I am very favorably impressed with the testimony of Dr. Prout in its entirety.

The petitioner then called as his final witness Dr. Christopher C. Beling, an expert in the treatment of mental and nervous diseases who stated that he examined the petitioner on two occasions, once in September, 1927, and once on March 8th, 1928. Dr. Beling stated very forcibly that in his opinion the accident of July 2d, 1926, was the cause of the petitioner's present disability, which Dr. Beling estimated as one hundred per cent. total disability. Dr. Beling admitted that he found no neurological symptoms in September, 1927, when he examined the petitioner, but that when he examined the petitioner again on March 8th, 1928, he found the neurological picture which presents itself at the present time, and that this is the course that he would expect the petitioner to travel, having in mind the trauma inflicted upon him on July 2d, 1926.

The respondent's cross-examination of these doctors was based on the presumption and assumption that the petitioner's condition was "practically the same" or "the same" as it had been in 1923, following an accident which occurred to petitioner's foot. In view of the fact that Dr. Dowd, the only neurologist on behalf of the respondent who actually examined the petitioner, stated that the neurological picture of 1923 and 1928 were "entirely dissimilar," it appears to me that the cross-examination and whatever result may have been sought for, were futile in the face of this testimony of Dr. Dowd. Certainly, if the only neurologist on behalf of the

respondent who examined the petitioner found an entirely different neurological picture in 1928 from what existed in 1923, then the cross-examination, as founded on the assumption of counsel that the neurological picture was the same, or practically the same in 1923 as in 1928, is without force and effect. Again, so far as the testimony in the case shows the foot condition which was caused by the accident of 1923 does not at present exist.

At this point, it might be well to call attention to the fact that there is a strong dovetailing of the testimony of the petitioner and respondent in one regard, and that is that the petitioner in September, 1927, showed no apparent neurological symptoms of any kind. Dr. Dowd testified to that, on behalf of the respondent, and Dr. Beling also coincided in this statement, on behalf of the petitioner. Inasmuch as the last examination of the petitioner by any of the respondent's doctors was at this time, to wit, September, 1927, it becomes readily apparent that the respondent's doctors are not in a position to state the petitioner's present condition, and his course of development since September, 1927, as compared to the petitioner's doctors, who have examined the petitioner on different occasions from that time to the present date.

The respondent's case commenced on April 3d, 1928, the second trial day, and Dr. Buck, the plant physician was sworn as the first witness. Dr. Buck testified that he did not find any symptoms of head injury on the part of the petitioner, and that the petitioner did not complain to him of any head injury, and that when he asked the petitioner where he was injured, in addition to his chest and back, the petitioner said "nowhere else." Dr. Buck did say, however, that he did not carefully examine the petitioner's head for signs of injury. And it might be worth noting here that though the petitioner, according to the respondent's testimony, was not severely injured, yet he was confined to the hospital at the suggestion of Dr. Buck for two days under observation. What the observation was for, of course, is entirely conjectural, because the records of the hospital, or any reference as to their contents was not adduced.

Two nurses were also introduced, on behalf of the re-

spondent, who testified that the petitioner neither complained of any head injury, nor, when questioned regarding whether or not he had been injured anywhere else, stated that he had received any head injury. However, owing to the fact of the petitioner's very poor use of the English language, and to the fact that he was undoubtedly badly shaken up at the time, I do not place very much weight on the testimony to that effect.

In like manner I might dispose of the testimony of the three lay witnesses who were introduced to show that the petitioner had not suffered a head injury. Not a single one of them saw the petitioner actually struck anywhere. They saw him on his feet, placing his hands to his chest, then slumping down. Suffice to say that I am not favorably impressed with their testimony because, if the accident was as they contend, I do not see how he could have injured even his back and chest, much less to have suffered an injury of sufficient consequence for the petitioner to have been sent to the hospital for two days. In short, I believe that the petitioner suffered injury to his head at the time of the accident, but that the same did not show up for some considerable time later, and that this was the reason for his failure to complain of his head when given first aid by Dr. Buck and the nurses, when one also takes into consideration the fact of his poor knowledge of the English language, and his undoubted dazed condition at the time of the injury.

Dr. Keppler, an orthopedic surgeon, was introduced by the respondent as were Dr. Holden and Dr. Kessler. These three doctors are orthopedic or industrial surgeons, and the total of their examination might be summed up briefly to the effect that they contend that the petitioner was neurotic preceding the accident of July 2d, 1926, and that the accident of July 2d, 1926, played no part in the petitioner's present condition. None of these three doctors is a neurologist, or has qualified as a neurological expert.

On the part of the respondent, Dr. Dowd was next introduced who testified that the petitioner's condition, in his opinion, was not the result of the accident of July 2d, 1926. The last time this doctor examined the petitioner was in

December, 1927, at which time no neurological symptoms were apparent, which of course is agreed to by Dr. Beling on the petitioner's side of the case. Dr. Dowd, however, re-iterated several times that the petitioner's present condition was totally different from that of the neurological picture presented in 1923 which, in my opinion, takes the ground work completely from under respondent's cross-examination of petitioner's neurologists which was based upon the fact, as stated before, that the petitioner's neurological picture was the same in 1923 as in 1928. Dr. Dowd in a very informative and interesting manner admitted, however, that an arterial scelerotic condition in the sells turcica might be aggravated by a trauma or that a new growth in the brain or meninges might have caused the petitioner's present condition, or that a degenerative process in the basil ganglia and connecting paths might have been hastened by a trauma, causing the neurological deterioration testified to by the petitioner's doctor. The doctor also stated that it cannot be denied that trauma may play a part in a Parkinsonian syndrome.

The next witness produced by the respondent was Dr. Washington, who, though he admitted that the majority of his practice for years past has been appearing for defendants in negligence actions in the upper courts, classified himself as an expert neurologist also. Dr. Washington never examined the petitioner, so far as the testimony shows, and his testimony was based purely and wholly on hypothetical questions propounded to him by counsel for the respondent. Dr. Washington stated that in his opinion the trauma of July 2d, 1926, did not cause the petitioner's present condition.

It might be stated at this point, emphatically, that not a single other causative factor than the trauma of July 2d, 1926, is advanced by the respondent's medical witnesses as the cause of the petitioner's present condition of disability. Though in their opinion the trauma did not cause the petitioner's present condition, yet they are unable to, or at least did not, state what it was, if not the trauma of July 2d, 1926, which caused the petitioner's present condition. The respondent's reliance on the fact that the petitioner's neurological picture was the same in 1923 as in 1928 was completely

shattered by two factors which appeared in the case, viz., the fact that the only neurologist who examined the petitioner, on behalf of the respondent, stated that the neurological picture was entirely different in 1928 from what it was in 1923, and, second, that although both respondent's and petitioner's witnesses agree that in a case presenting a picture of neurological retrogression, as in this case, that there is no remission of symptoms, and that though the symptoms might change or be slightly diminished there is no cessation of the symptoms and then a spontaneous recurrence of them again, both the respondent's and petitioner's neurologists agree there was a lack of gross neurological symptoms in September, 1927.

As to the petition which was introduced on behalf of the respondent, it is sufficient to say that it does not appear who filled out the petition, whether Mr. Greenstone, or some clerk in his office, or that the person who filled out the petition had any better means of understanding what the petitioner stated than both counsel and myself had when an interpreter was not used. Furthermore, the fact of no head injury appearing in the first petition, which was dismissed for lack of prosecution, is more than offset by the fact that Dr. Bergman testified that within three months of the accident the petitioner came to him for treatment for a head condition, complaining that he sustained a head injury, in addition to other anatomical injuries, in the accident of July 2d, 1926. The only other possible explanation for Dr. Bergman's statement to this effect is that Dr. Bergman is stating an untruth, a fact which was not even suggested by the respondent in this case. Furthermore, if as much attention was given to filling out the petition as was afterwards shown in the prosecution of the original petition, which was dismissed for lack of prosecution and allowed to lie in that condition until the limitation in the statute had almost run, then I do not believe much stress can be placed on that so far as any probative force or effect is concerned.

Again in the conduct of this case, as in the conduct of many others which I have heard, in viewing the actions of the witnesses, their demeanor on the stand as they gave their testimony, their manner of answering, apparent interest or lack of

interest, and the other factors which may have motivated their testimony, if indeed there were any, were all taken into consideration by me. After listening to the various witnesses on the stand, observing them closely, observing their position in reference to the case, their connection with the case, and their ability to have seen the things which they stated they had seen, and also the facts which they claim they found and ascertained, their manner of testifying while on the witness stand under both direct and cross-examination, I have come to the conclusion, without much difficulty, that the petitioner has established his case by the ample preponderance of the evidence that he is at the present time suffering from a disability permanent in character and partial in quality, amounting to fifty per cent. of total disability, and that the cause of his present permanent disability, as stated, was the trauma which the petitioner suffered in the accident of July 2d, 1926, when he injured not only his chest and back but also the back of his head, resulting in a brain injury as described by the petitioner's doctors, which gradually began a course of progress until it resulted in the picture we see before us today, *i. e.,* a man one-half disabled, when considered as a physiological unit for the purpose of industry.

In regard to respondent's contention, brought up after the trial, that the award granted to the petitioner for his foot injury of 1923 should be deducted from this award, I cannot agree for two reasons: First, the respondent's own questions in the case were predicated on the fact that there had been a cure of the petitioner's foot; and, secondly, the doctors who gave their testimony estimated the disability as a neurological disability with no mention whatsoever of the foot element in it at all, and also the estimates of the doctors on behalf of the petitioner (the only estimates of disability in the case) were that the petitioner suffered over sixty per cent. total disability, according to Dr. Bergman, fifty per cent. total disability according to Dr. Prout, and one hundred per cent. of total disability according to Dr. Beling. And inasmuch as all the testimony in the case was apparently given with the understanding that the foot condition had been cured, and inasmuch as the neurologists testified that the petitioner was

disabled, in the percentages which they variously expressed, from a neurological standpoint I do not think that the respondent's claim at this late date is of any avail. If, as the respondent contends, the disability vanished upon the payment of the award for the foot condition, the respondent had available to him the remedy provided by the statute, *i. e.*, to file a petition for a modification of the award on the ground of decreased disability. The proceeding is entirely a statutory one and must be followed strictly by the respondent, if he is to avail himself of the provisions of the act. Obviously the respondent did not so avail himself, and at this late date comes in and by means of a letter attempts to have this bureau determine that the respondent is entitled to what amounts to a recoupment or set-off for disability payments heretofore made. I do not find that the respondent is entitled to any such credit.

I might add, that, in this aspect of the case, our courts have decided that there is no relief for the respondent as against the petitioner, especially in the case of *Levins* v. *Fulton Specialty Co.*, 122 *Atl. Rep.* 343, where in a unanimous decision of the Court of Errors and Appeals of this state, it was held:

"The proceeding is a statutory one, and there is no provision in the statute for a return of any money which may have been paid, either voluntarily or involuntarily, to an injured workman. Statutory proceedings must be closely followed. The statute cannot be construed to give to a court powers other than those specifically mentioned in the act."

There are other cases holding similarly. Therefore, I shall deny the respondent's right to have the award of permanent disability of the foot as the result of the accident of 1923, deducted from the present award of fifty per cent. of total disability.

In accordance with my conclusion herein, and more specifically setting forth my findings as to details, I have hereto annexed my determination and made it a part hereof.

CHARLES E. CORBIN,
*Deputy Commissioner.*